**Gregory DAVIS and Jeffrey Kirk, Appellants,**

v.

**CITY OF KOKOMO, Indiana, Appellee.**

**No. 34A02–0908–CV–793.**

Court of Appeals of Indiana.

Jan. 21, 2010.

Rehearing Denied March 24, 2010

in which Husband could purge himself of the contempt.

John F. Kautzman, M. Elizabeth Bemis, Ruckelshaus Kautzman Blackwell Bemis & Hasbrook, Indianapolis, IN, Attorneys for Appellants.

Michael P. Maxwell, Jr., Russell L. Brown, Clark Quinn Moses Scott & Grahn, Indianapolis, IN, Attorneys for Appellee.

## OPINION

DARDEN, Judge.

### *STATEMENT OF THE CASE*

Gregory Davis and Jeffrey Kirk appeal the trial court's order affirming in part the findings of the Kokomo Board of Public Works and Safety ("Board") that they had committed violations that warranted disciplinary action.

We affirm.

### *ISSUES*

1.  Whether the trial court erred in deferring to the Board's construction of the Kokomo Police Department's general orders and collective bargaining agreement and affirming in part the Board's findings.

2.  Whether the Board's decision was improperly influenced by *ex parte* information and pressure from the local administration.

### *FACTS*

During the relevant time period, Davis was a merit-promoted captain in the Kokomo Police Department ("KPD"). As the appointed Major of Investigations, he was also second in command[1] to KPD Police Chief Robert Baker. Kirk was a lieutenant in the KPD and worked in the Criminal Investigation division.

In 2006, "there came into existence a compilation [packet] of written statements and reports containing allegations of improper acts and associations by members

---

1.  "The rank structure of the [KPD] in sequential order of command is as follows: 1. Chief of Police; 2. Major of Investigation Division; 3. Major of Support Division; 4. Major of Patrol Division; 5. Captain; 6. Lieutenant; 7. Sergeant; [and] 8. Patrol Officer/Employee." (Davis' App. 241).

of local law enforcement in connection with a Kokomo businessman named Dan Dumoulin...." (Findings 2).

In January of 2008, Chief Baker received the packet from his predecessor. Chief Baker and Davis met with Howard County Sheriff Marshall Talbert and Major Steve Rogers of the Howard County Sheriff's Department to discuss the allegations. Chief Baker gave the packet to KPD Professional Standards Unit Commander Captain David Mitchell, with instructions to review the packet "to see if there was anything ... [KPD] should do." (Board Hrg. Tr. 228). On January 29, 2008, Captain Mitchell returned the packet to Chief Baker, having concluded that no internal investigation was warranted. Chief Baker took the packet to his personal residence and stored it in his safe.

In January 2008, Kokomo Fire Department ("KFD") Investigator Glenda Myers requested KPD's assistance with some pending arson investigations. KPD Detective Tonda Cockrell was assigned to assist her. Myers, Cockrell, Kirk and Davis met on February 8, 2008 to discuss the arson investigations. Myers reported to the group that she had uncovered evidence that implicated Dumoulin and worried that her investigation might be compromised because of Dumoulin's known associations with certain KPD officers. On February 13, 2008, Davis advised Chief Baker of Myers' concerns and recommended that the Dumoulin investigation should be conducted by an independent agency, and Chief Baker agreed.

On February 17, 2008, Howard County Sheriff's Deputy Matt Roberson contacted Davis about an audio recording that he thought might be relevant to the Dumoulin investigation. Roberson worked on the Howard County Drug Task Force with

KPD officers, including Sergeant Mark Miller. Roberson had provided recording equipment to a woman named Dawnetta Trott, who had recorded a conversation with Sergeant Miller without his knowledge on February 15, 2008. Trott was formerly romantically involved with Dumoulin and was the source of numerous allegations in the packet.

On February 19, 2008, Davis and Roberson listened to the audio recording together, and Roberson provided Davis with a copy. On the audio recording, Miller told Trott that the investigation of Dumoulin and the allegations in the packet had been reopened; that Trott should not cooperate with police if she was contacted; and that she need not fear for her safety because Chief Baker had told him that the packet had been destroyed and that its contents would never be seen again. Miller is heard having a sexual encounter with Trott.

After listening to the audio recording, Davis failed to disclose the existence of the audio recording or its contents to the KPD Professional Standards Unit. Nor did he "draw" a confidential internal investigation number regarding the alleged misconduct of Miller and/or Chief Baker at the time. (Board Hrg. Tr. 211).

Several days later, on February 25, 2008, Davis played the audio recording for Kirk and ordered him not to discuss its existence or contents with anyone, including his immediate supervisor. As a result, Kirk withheld the information from his supervisor. Davis and Kirk agreed that the audio recording potentially implicated Miller and/or Chief Baker in criminal misconduct; however, neither man disclosed the allegations to the Professional Standards Unit or drew a confidential internal investigation number.[2] On February 27,

---

**2.** Although Kirk did "record[ ] his findings and analysis regarding the contents of the Miller–Trott audio recording in the form of an

initial case report, [he] had no confidential

2008, at Davis' direction, Kirk met with the FBI.[3] Kirk played the audio recording for the FBI and requested assistance with the investigation.

On or around March 16, 2008, Howard County Sheriff Talbert learned about the audio recording and threatened to disclose the allegations to the media if they did not follow KPD's reporting policy. Davis and Kirk concluded that they had no choice but to bring the audio recording to the attention of Kokomo Mayor Greg Goodnight and Chief Baker. The next day, Davis, Kirk, and Chief Baker met to discuss the audio recording and the allegations contained therein. When Davis and Kirk asked Chief Baker to produce the packet, Chief Baker responded that Captain Mitchell had it. Captain Mitchell was summoned, and he denied having the packet, insisting that he had returned it to Chief Baker. It was later determined that the packet was in a safe at Chief Baker's residence. Kirk accompanied Chief Baker to his residence; they retrieved the packet and returned to headquarters.

When Mayor Goodnight later arrived at police headquarters, Davis and Kirk apprised him of the developments in the Dumoulin investigation, including the existence of the audio recording. Kirk, Davis, Chief Baker and Mayor Goodnight[4] then listened to the audio recording and discussed disciplinary measures[5] to be taken against Sergeant Miller.

Subsequently, Chief Baker instructed Captain Mitchell to draw confidential internal investigation numbers for professional standards investigations of both Davis and Kirk. On March 24, 2008, Davis and Kirk received notice that they were being investigated and were being placed on administrative leave. Davis was also demoted from second in command as Major of Investigations to his merit-promoted rank of Captain.

On March 27, 2008, a local reporter contacted Kirk regarding allegations of marital infidelity by Chief Baker. Kirk declined to comment. Later, while Kirk was in the vicinity of Chief Baker's home, he telephoned Chief Baker and asked to speak with him outside. Kirk had earlier requested a no-trespass order against Chief Baker coming to his residence. Kirk and Chief Baker talked for approximately ten to twenty minutes in the driveway as Mrs. Baker watched from a window. Kirk told Chief Baker about the reporter's inquiry and that he had "better get things right with [his] wife" before the story was published. (Board Hrg. Tr. 317). He also told Chief Baker that although he was angry with him, he still considered him a friend, and that the internal investigation into himself and Davis had been conducted unfairly. Chief Baker and his wife later testified that they had felt intimidated by Kirk's visit.

Over the ensuing months, as Captain Mitchell conducted professional standards investigations of Davis and Kirk, the local media published numerous articles regarding the Dumoulin investigation; Dumoulin's associations with several KPD officers; the internal investigations of Kirk and Davis; the Miller–Trott audio recording; numerous allegations within the packet; and, Kirk's visit to Chief Baker's residence.

internal investigation number assigned to the document." (Findings 5).

3. Roberson was also present during Kirk's meeting with the FBI.

4. Captain Mitchell was not present when the audio recording was played.

5. Chief Baker instructed Davis and Captain Mitchell to offer Miller the opportunity to either resign his rank voluntarily or to be subject to a professional standards investigation. On March 18, 2008, Davis and Captain Mitchell confronted Miller, who voluntarily resigned his rank and was reassigned.

On July 16, 2008, Chief Baker filed notices of disciplinary charges against Davis and Kirk with the Board. Counts I, II, and III charged Davis and Kirk with neglect of duty;[6] a violation of KPD rules;[7] and, conduct unbecoming an officer, respectively.[8] Specifically, Count I alleged that Davis and Kirk had failed to report the allegations against Sergeant Miller and Chief Baker to the Professional Standards Unit within five days of receiving the audio recording. Count II alleged that Davis and Kirk, as officers with supervisory authority, had failed to report the allegations to their immediate supervisors. Count III alleged that Davis and Kirk had misused or abused their supervisory authority. Count IV alleged that Davis and Kirk had conducted themselves in a manner that dishonored the KPD. Count V alleged that Kirk committed criminal intimidation[9] when he went to speak to Chief Baker at his residence on March 26, 2008.

On September 5, 2008, the Board conducted a public evidentiary hearing. Occasionally, during the fourteen-hour hearing, there were outbursts from some attendees. Each time, Board President James Brannon managed to keep the proceeding in order. After one such outburst, witnesses observed Mayor Goodnight make a gesture to President Brannon to restore order.

After the hearing, the Board held two executive sessions to discuss the evidence. On September 17, 2008, the Board issued its decision findings, namely that

Davis and Kirk violated I.C. 36–8–3–4(b)(2)(A) and (B) with[in] the meaning of KPD G.O. 26.1.1(v) for failure to properly notify the Professional Standards Unit [Count I]; that Davis violated I.C. 36–8–3–4(b)(2)(A) and (B) within the

meaning of the KPD G.O. 26.1.1(v) for failure to timely report an alleged incident of misconduct [Count II]; that Davis violated I.C. 36–8–3–4(b)(2)(A), (B) and (H) within the meaning of KPD G.O. 26.1.1(v) for misuse of supervisory authority in ordering Kirk to not to [sic] report alleged acts of misconduct to his immediate supervisor [Count III]; that Kirk violated I.C. 36–8–3–4(b)(2)(A), (B), and (H) within the meaning of KPD G.O. 26.1.1(v) for appearing at the home of Chief Baker resulting in the Chief and his wife being intimidated [Count V].

(Findings 14). The Board found insufficient evidence to support a finding that Kirk had (1) violated any statute or KPD general order by his failure to report the allegations to his immediate superior (Count II); (2) abused or misused his supervisory authority (Count III); and (3) dishonored the KPD (Count IV). The Board did conclude that Davis should be demoted from the rank of Captain to the rank of Lieutenant, suspended for five days without pay, and placed on probation for one year upon his return to regular duty; and, that Kirk should be demoted from the rank of Lieutenant to the rank of Patrolman, suspended for ten days without pay, and placed on probation for one year.

After the Board had issued its findings, President Brannon asked Chief Baker whether Trott was a confidential KPD informant. Chief Baker advised that she was not. Days later, *The Kokomo Perspective* interviewed Brannon, and he told the reporter that Board members did not believe Trott to be a KPD confidential informant and, therefore, the contents of the audio recording were not evidence of a crime.[10]

---

6. Ind.Code § 36–8–3–4(b)(2)(A).

7. I.C. § 36–8–3–4(b)(2)(B).

8. I.C. § 36–8–3–4(b)(2)(H).

9. I.C. § 35–45–2–1(a).

10. Brannon further commented that Sergeant Miller's conduct on the audio recording merited a professional standards investigation.

On October 16, 2008, Davis and Kirk filed a verified petition for judicial review of the Board's decision. The trial court conducted evidentiary hearings on November 25, 2008 and February 6, 2009. On April 27, 2009, the trial court issued its findings of fact, conclusions of law, and order of final determination, wherein it stated, in pertinent part, the following:

14. There was undisputed evidence submitted to the Board that (1) on February 19, 2008, Davis heard and took possession of the Miller/Trott audio recording; (2) on February 25, 2008, Davis shared the recording with Kirk; (3) both Davis and Kirk, upon hearing the recording believed that it contained evidence of police misconduct; and (4) neither Davis nor Kirk drew a professional standards unit internal investigation number.

15. The disputed issue between the parties is whether the decision of the Board was arbitrary and capricious because it was not supported by substantial evidence as to whether Davis and Kirk had an obligation to draw an internal investigation number within the five day requirement of section 13.B) of the FOP Agreement.

16. At the Board hearing, the Police Department presented evidence that the five day reporting requirement applied in this case. The plain meaning of section 13.B) requires that an officer of the Department shall within five (5) working days from the time of the receipt of an allegation of misconduct, initiate a formal investigation and assign a confidential investigation case number.

17. At the Board hearing, witnesses testified that no exemption to the five day requirement exists for allegations against the Chief of Police, despite Police Department General Order 52 which requires that the commander of the Professional Standards Unit report the allegations to the Chief.

18. Testimony was presented that investigative numbers had been drawn in the past on one or more previous chiefs of the Kokomo Police Department.

19. Testimony was presented that no policy exists giving an officer the right to make a determination that he or she does not have to file an allegation of misconduct or draw a number initiating a formal investigation.

20. The plain meaning of section 13 of the FOP Agreement is that section 13.E) does not exempt the assignment of an investigation number, but instead it exempts the Police Department's obligations for notification of the employee of such an investigation. At the Board hearing, witnesses testified that the decision to withhold notification under section 13.E) is not made by the officer who received the notification of alleged misconduct, but is made by the Professional Standards Unit as a discretionary right.

21. At the Board hearing, petitioners presented testimony, mainly through Davis, that section 13.E) of the Agreement gave him the authority to choose not to draw an internal investigation number and file a complaint with the Professional Standards Unit within five (5) days because the audio recording included allegations against Chief Baker, and because of the potential of jeopardizing an on-going criminal investigation. Thus, Davis chose to disregard section 13.B)'s five day requirement. Kirk testified that he "never gave any thought to going and pulling a number" or otherwise complying with the Agreement's five day requirement because of the recording's contents.

22. In making its findings of fact, conclusions of law and determination, the Board weighed the competing evidence presented by the parties. Given the standard of review, this court is not

permitted to weigh conflicting evidence. Although this court may have made different decisions here given all circumstances, this court is limited to determine whether there was sufficient evidence to permit the Board to reach its conclusion that the five day requirement applied here.

23. There was sufficient evidence presented at the board hearing supporting the Board's determination that Davis and Kirk were required to draw an internal investigation number within five (5) days of receiving the audio recording, and that their failure to do so was a violation of Kokomo Police Department's FOP Agreement and General Order 26–1–l(v) Art. 1.01.

24. There was sufficient evidence presented at the board hearing supporting the Board's determination that Davis failed to timely report the alleged incidents of misconduct in violation of the Kokomo Police Department's General Order 26–1–1(v) Art. 2.03.

25. The Board determined that Davis' instruction to Kirk to withhold certain information from his supervisor and to be dishonest with that supervisor with regard to certain actions were a failure of Davis's supervisory duties and a violation of I.C. 36–8–3–4(b)(2)(a), (B) and (H) within the meaning of the Kokomo Police Department's General Order 26–1–l(v) Art. 2.06 ("Finding Three").

26. The evidence submitted at the board hearing was that when Davis shared the contents of the audio recording with Kirk on February 25, 2008, Davis ordered Kirk not to disclose the information to anyone, including Kirk's supervisor Captain Brian Thompson. A few days later, Kirk told Captain Thompson he had to go to Indianapolis for a doctor's appointment but instead attended a meeting with Agent Turner from the F.B.I., where the contents of the audio recording were discussed.

27. As a Major with the Police Department, Davis had wide latitude in how he conducted his day-to-day activities; however, he was required to conduct such activities in accordance with Police Department policies. General Order 21(3)(1).

28. As discussed above, Davis and Kirk had an obligation based upon their belief that the recording contained allegations of misconduct by Police Department Officers, to draw an internal investigation number so a formal investigation could commence. Despite this obligation, Davis ordered Kirk not to comply.

29. There was sufficient evidence presented to the Board to support their conclusion that Davis misused or abused his supervisory powers over Kirk to cause Kirk to violate Police Department policies per "Finding Three."

30. The Board determined that Kirk's visit to Baker's home on March 27, 2008 and the publicity which was received by the visit, reflected poorly upon both Kirk as an officer of the Police Department and the Police Department as a whole, and thus violated I.C. 36–8–3–4(b)(2)(A), (B) and (H) within the meaning of the Police Department's General Order 26–1–1(v) Art. 3.01.

31. As charged, Count IV alleged that the actions of Davis and Kirk resulted in the discredit and disruption of the operation and efficiency of the Kokomo Police Department and its members, with no factual reference made to Kirk's visit to Baker's home. In its conclusions, the Board found insufficient evidence to support a finding that Davis had committed the violations alleged in Count IV, but found Kirk had committed the violation of conduct unbecoming a police officer by his conduct at Baker's home.

32. The Board charged Kirk in Count V with committing the misdemeanor

crime of intimidation by his conduct at Baker's home on March 27, 2008. In its conclusions entered after the hearing, the Board concluded that there was insufficient evidence that Kirk had committed the violations alleged in count V.

33. Kirk was not properly charged with violating general orders and statute for bringing discredit and disrepute to the department for his actions at Baker's home on March 27, 2008. Kirk was not properly noticed [sic] that his actions on March 27, 2008, were subject to the charged rule violations under Count IV, and therefore, he was not afforded the opportunity to present a proper defense by testimony and evidence specifically focused on those rule violations instead of the charges of criminal intimidation as charged in Count V.

34. This court finds and concludes insufficient evidence [was] presented concerning how or if Kirk's appearance at Baker's home caused discredit or disrepute on Kirk or the department.

35. This court concludes that the factual basis for which Kirk was disciplined under Count IV was not the factual basis for which he was charged. It was error for the Board to misapply the factual basis with the charged violations. "Any substantial variance between the cause charged and the facts stated is fatal." *City of Washington v. Boger*, 132 Ind.App. 192, 176 N.E.2d 484, 489 (1961).

36. This court finds and concludes that the Board's decision to discipline Kirk under Count IV of the disciplinary charges as filed was not supported by substantial evidence, was in violation of legal authority, and thus, was in error.

37. Petitioners allege that the Board received *ex parte* communication and "pressure" from the City Administration with respect to its decision.

38. If the evidence "indisputably in the record" before the Board was sufficient to uphold the decision of the Board, this court need not consider whether *ex parte* communications occurred with the Board, and what, if any, impact those communications had on the Board's decision. *McDaniel v. City of Evansville*, 604 N.E.2d 1223, 1224 (Ind.Ct.App. 1992).

39. Whether or not the Board believed Ms. Trott was a "confidential informant" with the Kokomo Police Department had no import on the evidence submitted to the Board supporting their decisions that Davis and Kirk violated department rules and policies by failing to timely draw an internal investigation number with the Professional Standards Unit, so that a proper, formal internal investigation concerning allegations against Miller and/or Baker raised by the Miller/Trott audio recording could be conducted.

40. Given the sufficiency of the evidence before the Board, the petitioner's allegations of *ex parte* communication and improper "pressure" are insufficient to overturn the Board's decision.

(Findings 19–25). The trial court overturned the Board's imposition of one-year probationary periods for both Davis and Kirk, noting that such an order exceeded the scope of the Board's statutory authority under its enabling statute. *See* I.C. § 36–8–3–4(b).

Thus, the trial court affirmed the Board's determinations that Davis had committed violations under Counts I, II, and III; and that Kirk had committed a violation under Count I. It also remanded to the Board with instructions to vacate its finding that Kirk had committed a violation under Count IV; and to modify its final determination and imposition of discipline to reflect only one violation for Kirk

on Count I. The trial court also ordered the Board to vacate the one-year probationary periods imposed upon both Davis and Kirk.

Additional facts will be provided as necessary.

## DECISION

Davis and Kirk assert that the trial court employed the wrong standard of review; that the Board's decision to demote and suspend them was not supported by substantial evidence; and that the Board's decision was influenced by *ex parte* information and pressure from Mayor Goodnight's administration. We address each of their contentions in turn.

### 1. *Standard of Review*

■ Davis and Kirk argue that the trial court erred in deferring to the Board's construction of the underlying KPD general orders and provisions of the collective bargaining agreement between the city of Kokomo and the Fraternal Order of Police ("FOP") rather than reviewing them *de novo*.

■ Judicial review of an administrative board's decision requires that due deference be given to the expertise of that board. *Bird v. County of Allen*, 639 N.E.2d 320, 327 (Ind.Ct.App.1994). *See Hoosier Outdoor Advertising Corp. v. RBL Management, Inc.*, 844 N.E.2d 157, 163 (Ind.Ct.App.2006) ("[F]aced with two reasonable interpretations of an ordinance, one of which is supplied by an administrative agency charged with enforcing the ordinance, the court should defer to the agency."), *trans. denied.* "Neither the trial court nor this court may reweigh the evidence; instead, reviewing the record as a whole, the trial court must determine whether the board's decision was supported by substantial evidence." *Andria-*

*nova v. Family & Soc. Servs. Admin.*, 799 N.E.2d 5, 7 (Ind.Ct.App.2003).

■ Indiana Code section 36–8–3–4(h) further provides that "[a] decision of the safety board is considered *prima facie* correct, and the burden of proof is on the party appealing." Specifically, an aggrieved party who is attacking the evidentiary support for the agency's findings bears the burden of demonstrating that the agency's conclusions are clearly erroneous. *Yater v. Hancock County Planning Comm'n*, 614 N.E.2d 568, 570 (Ind. Ct.App.1993) (citation and internal quotation marks omitted).

■ The agency's decision will be reversed only if it is unsupported by substantial evidence, it is arbitrary and capricious, or is contrary to any constitutional, statutory, or legal principle. *Fornelli v. City of Knox*, 902 N.E.2d 889, 892 (Ind.Ct. App.2009). Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Civil Rights Comm'n v. County Sheriff's Dept.*, 644 N.E.2d 913, 915 (Ind.Ct.App.1994). An arbitrary and capricious decision is one which is "patently unreasonable" and is "made without consideration of the facts and in total disregard of the circumstances and lacks any basis which might lead a reasonable person to the same conclusion." *City of Indianapolis v. Woods*, 703 N.E.2d 1087, 1091 (Ind.Ct.App.1998).

In light of the Board's expertise in the area of enforcing statutes pertaining to discipline, demotion, and dismissal of police officers and firefighters for the City of Kokomo,[11] we find no clear error in the trial court's deference to its interpretation of the regulations at issue herein. Thus, we would reverse only if the Board's deci-

11. *See* I.C. § 36–8–3–4.

sion is unsupported by substantial evidence.

### 2. *Substantial Evidence*

■ We therefore proceed to a discussion of whether the Board's findings that Davis and/or Kirk violated KPD's general orders and provisions of the collective bargaining agreement when (1) both failed to draw an internal investigation number within five days of receiving the audio recording (Count I); (2) whether Davis, an officer with supervisory authority, failed to timely report alleged incidents of misconduct to the Professional Standards Unit (Count II); and, (3) whether Davis misused or abused his supervisory authority by ordering Kirk not to inform his immediate supervisor of the alleged misconduct they had discovered (Count III), were unsupported by substantial evidence, arbitrary and capricious, or contrary to any constitutional, statutory, or legal principle. *Fornelli*, 902 N.E.2d at 892.

Davis and Kirk contend that because Chief Baker was one of the persons accused of the alleged misconduct, they were exempt from the five-day reporting requirement. They contend that KPD's policies as written did not contemplate such a unique circumstance, that compliance with the policies would have effected an unjust or absurd result because Chief Baker was required to be notified of the confidential internal investigation into allegations of his own misconduct. In the alternative, Davis also argues, that as the second highest ranking officer to Chief Baker, he was conferred with certain discretionary authority to determine whether compliance with KPD's policies would compromise the investigation. Thus, Davis and Kirk argue that substantial evidence does not support the Board's findings that they violated KPD's policies. We cannot agree.

The applicable provisions of the collective bargaining agreement ("CB Agreement") between the Board and the F.O.P. provide, in relevant part:

13.A) The Internal Investigation process will be deemed to commence when the notification of alleged misconduct is communicated to any officer of the Kokomo Police Department who maintains functional responsibility as a supervisor of that agency.

13.B) The department, shall within (5) five working days from the time of receipt of such information, initiate a formal investigation and assign a confidential internal investigation case number.

13.C) At such time that a formal investigation is initiated and confidential internal investigation number assigned, a formal complaint form will be completed by the complaining party if not already submitted prior to this date.

13.D) Notification will be made to the Employee within 24 hours of their first scheduled work day indicating that such a complaint has been made. A copy of the complaint form indicating, 1) the nature of the complaint, 2) date and time of the alleged misconduct, 3) complaining party, will be forwarded to said Employee at such time they return to duty on their first scheduled work day.

13.E) The department may elect to withhold notification to the Employee of said internal investigation in such cases where criminal misconduct is alleged to have been committed and notification of such investigation would compromise said investigation. In such cases, the department will provide written explanation to the Employee upon completion of said investigation and the initiation of interviewing.

(Davis' App. 240). Further, KPD's general order 52.2.6, governing notification to the police chief, provides as follows:

The procedures for notifying the Police Department Chief Executive Officer of

complaints against the agency or its employees are:

A. The Professional Standards Commander has the authority and responsibility to report directly to the Police Department Chief Executive Officer all complaints against the agency or its employees;

B. The Professional Standards Commander shall immediately bring to the attention of the Police Department Chief Executive Officer those complaints which include allegations of corruption, or brutality, or misuse of force, or breach of civil rights, or criminal misconduct, or those complaints alleging personal injury or damage to property;

C. The Professional Standards Commander may postpone bringing to the attention of the Police Department Chief Executive Officer all other complaints pending the conclusion of the professional standards investigation; and/or field supervisory investigation. . . .

(Davis' App. 242).

Section 13.A) of the CB Agreement expressly provides that upon receipt of information alleging criminal misconduct by a KPD employee, a KPD supervising officer *must* draw a confidential internal investigation case number, thereby, initiate a formal internal investigation. Davis and Kirk correctly assert that KPD's General Order 52.2.6 does require the Professional Standards Commander to "immediately" report *all* "allegations of corruption, or brutality, or misuse of force, or breach of civil rights, or criminal misconduct, or those complaints alleging personal injury or damage to property" against KPD or its employees to the KPD police chief. (Davis' App. 241). However, regarding "all other complaints," the Professional Standards Commander may, in his or her discretion, wait to notify the police chief until the investigation has been concluded. *Id.*

Upon review, unlike Davis and Kirk, we discern no conflict between KPD's General Order 52.2.6 and section 13.E) of the CB Agreement that would serve, under the circumstances, to justify their noncompliance therewith or their unilateral determinations that they were exempt from KPD's internal investigation procedural requirements.

Section 13.E) of the collective bargaining agreement qualifies the twenty-four hour employee notification requirement in section 13.D) and provides that notice to the subject of an internal investigation "may" be withheld if necessary to preserve the integrity of the investigation. Specifically, section 13.E) expressly grants to KPD's official in charge of the internal investigation—logically, the Professional Standards Unit Commander—the discretionary authority to withhold notice "where criminal misconduct is alleged to have been committed *and notification of such investigation would compromise said Investigation.*" (Davis' App. 240) (emphasis added).

Thus, had Davis and Kirk complied with the mandatory reporting requirements of section 13.A) and 13.B) of the CB Agreement, the Professional Standards Commissioner had the authority, pursuant to section 13.E), to exercise discretionary authority to preserve the integrity of the investigation by withholding notice of the allegations to Chief Baker until the internal investigation was completed. Further, at the evidentiary hearing, the trial court heard extensive testimony from various high-ranking KPD officials, who were familiar with the policies and procedures, that no exemption from the internal investigation procedural requirements exists for any KPD employee, including the police chief.

KPD Major of Investigations Jim Calabro, a twenty-one year veteran of KPD and member of the FOP collective bargaining negotiation committee since 1988, testified that compliance with the reporting requirements under the CB Agreement is mandatory for all KPD supervisors; and, that a supervisor must file an internal investigation complaint with the Professional Standards Unit "[a]nytime he receives reports of misconduct of an officer" within five days of receiving the information. (Board Hrg. Tr. 145). He testified that failure to comply with the reporting procedures violates the CB Agreement and would jeopardize KPD's ability to properly discipline the accused officer. He further testified that "every officer's treated exactly the same regardless of rank" under the CB Agreement; therefore (1) no KPD employee is exempted from compliance with its requirements; (2) nor are allegations of misconduct against the KPD police chief to be treated differently from allegations against any other KPD employee. (Board Hrg. Tr. 146). Lastly, he testified that where notification of the accused would compromise the internal investigation, the Professional Standards Unit commander—not the individual officer—is the only KPD official authorized to make the determination that notice should be withheld.

Captain David Mitchell, commander of the Professional Standards Unit and eighteen-year veteran of KPD, testified that under KPD's policies and procedures, Kirk and Davis were required to pull an internal investigation number regarding the allegations of misconduct against Sergeant Miller and Chief Baker, and to initiate a formal internal investigation. He also testified that KPD's policies, as written, were adequate to address allegations of misconduct even against a sitting police chief, noting that he had personally pulled an internal investigation number on a police chief and was aware of other situations in which internal investigation numbers had been pulled against police chiefs.

KPD Captain Christopher Smith, a twenty-four year veteran of KPD testified that he was currently the administrator of the KPD Training Division and had previously served as KPD's Accreditation Manager in charge of ensuring compliance with national standards. He testified that under KPD's policy, when a supervisor learns of an allegation of misconduct, the allegation must be transmitted "through the chain of command to give the documentation to the Professional Standards Unit." (Board Hrg. Tr. 283). He also testified that the police chief is subject to the same internal affairs investigation procedures as any other KPD employee, and that allegations of misconduct against KPD's police chiefs have never been exempt from the process.

It is undisputed that on February 17, 2008, Davis—the second highest ranking KPD official—learned of the existence of an audio recording that may have involved misconduct by Sergeant Miller. On February 19, 2008, he listened to the recording and received a copy. The recording was very damaging to Sergeant Miller, and Chief Baker's name was mentioned in it. He did not pull a confidential internal investigation case number or otherwise report the allegations to the Professional Standards Unit. On February 25, 2008, Davis shared the recording with Kirk, a KPD lieutenant with supervisory authority.[12] They agreed that the matter should be investigated by an outside agency since it involved Chief Baker. Davis ordered Kirk not to discuss the audio recording with anyone, including his immediate supervisor. Kirk complied with Davis' direct

---

12. General Order 26.1.1(v), Article 2, provides that all command officers of sergeant and above, shall report all alleged incidents of misconduct.

order; subsequently, when Kirk arranged to meet with the FBI in Indianapolis, he lied to his supervisor about his whereabouts. On March 17, 2008, Davis and Kirk were pressured into disclosing the existence of the audio recording through the proper channels of KPD. At that time, no confidential internal investigation number had been pulled and no formal investigation had been initiated by the Professional Standards Unit.

We conclude that the record contains "such relevant evidence as a reasonable mind might accept as adequate to support [the Board's] conclusion" that Davis and/or Kirk committed the violations charged in Counts I, II, and III. *Civil Rights Commission,* 644 N.E.2d at 915. Specifically, the record reveals that Davis and Kirk, pursuant to KPD's policy and the CB agreement, were required to pull a confidential internal investigation number within five days of receiving the audio recording; that Davis, a supervisor, failed to report an alleged incident of misconduct when he learned of it; and that Davis violated his supervisory authority when he ordered Kirk to withhold the existence of the audio recording from his immediate supervisor and to mislead his supervisor about his whereabouts. The trial court's judgment affirming Counts I, II, and III is not clearly erroneous.

### 3. *Discretionary Authority*

■ Davis argues that as the exempted Major of Investigations—"the highest ranking officer under the Chief of Police"—he was authorized to exercise discretionary authority concerning complying with the reporting requirements of sections 13.A) and 13.B) of the collective bargaining agreement. Specifically, he directs our attention to General Orders 21 and 1.2.2.

General Order 21 enumerates the duties and responsibilities of the KPD Major.

The position of Major is a non-contractual appointed position that manages and supervises one of the two major Divisions of the Police Department. The administrative nature of the duties requires the application of advanced knowledge and skills to the analysis of police problems to provide for a wide variety of law enforcement activities. Considerable latitude is permitted for independent action within the framework of Departmental policies. This position is under the direct supervision of the Chief of Police.

(App.245). General Order 1.2.2 addresses use of discretion by KPD officers and provides,

In the performance of his/her duty to serve society, an officer is called upon to make difficult decisions. He/she must exercise discretion in situations where his/her rights and liabilities and those of the Department hinge upon his/her conduct and judgment. An officer's decisions are not easily made and occasionally involve a choice which may cause him/her hardship or discomfort. An officer must be faithful to his/her oath of office, the principles of professional police service, and the objectives of the Department, and in the discharge of duty he/she must not allow personal motives to govern his/her decisions and conduct.

Discretionary power is the power of free decision, or latitude of choice within certain legal bounds. When this power is poorly exercised, discretionary power is viewed by the public as favoritism, bias or corruption.

\* \* \*

Uniformity in application of laws is necessary to gain public support. Application of tolerance in law enforcement is not an effort to destroy or distort the

intent of the law; it is designed to strengthen the spirit of the law by making enforcement reasonable.

In areas that are specifically covered by a state statute, General Order or other administrative procedure[,] discretion will be minimal. In all other areas, common sense, "fundamental fairness," and reasonableness shall prevail and discretion shall be the responsibility of the individual officer: With this responsibility comes equal accountability.

(Davis' App. 246–47).

Each of the above cited KPD general orders expressly limits the discretionary authority of KPD officers. General Order 21 acknowledges a Major's authority to take independent action, but expressly limits the scope of said authority to that "within the framework of Departmental policies." Stated differently, a Major's "considerable latitude" to act independently does not permit him to conduct himself in a manner that is inconsistent with KPD's policies. (Davis' App. 245). Further, General Order 1.2.2 provides that "[i]n areas that are specifically covered by a state statute, General Order or other administrative procedure[,] discretion will be minimal." (Davis' App. 246).

In light of the foregoing, we are not persuaded that Davis had the discretionary authority to circumvent KPD's mandatory reporting requirements under the circumstances herein. Accordingly, we conclude that substantial evidence exists in the record to support the Board's findings that Davis violated KPD's internal investigation procedures. We find no clear error in the trial court's judgment.

### 4. *Improper Influence*

■ Lastly, Kirk and Davis argue that the Board's decision was "partially based upon ex parte information, improper ex parte communication, and pressure imparted to the Board by the administra-tion," and "information not submitted as evidence" at the underlying proceedings. Davis' Br. at 14. They suggest that the Board was improperly influenced by Mayor Goodnight's gesture during the evidentiary hearing and by a conversation that occurred between Chief Baker and Board President Brannon after the Board issued its determination. The City of Kokomo counters that there was no evidence of undue influence exerted upon the Board.

In its brief, the City of Kokomo counters by citing to the case of *McDaniel v. City of Evansville*, 604 N.E.2d 1223, 1224 (Ind.Ct. App.1992), relied upon by the trial court for the proposition that because the record contains evidence sufficient to sustain the Board's findings that Davis and Kirk had committed violations, the reviewing court need not address their allegations of *ex parte* influences. McDaniel was an off-duty police officer of the Evansville Police Department. After an argument inside a bar, he and another officer followed a patron outside, beat him, and arrested him. When the patron attempted to flee, McDaniel beat him again "into submission." *Id.* at 1223. Afterwards, McDaniel "doctored the probable cause affidavit." *Id.* He was subsequently arrested and charged with battery, perjury, and obstruction of justice. He later pleaded guilty to battery and obstructing justice. The Merit Commission suspended, demoted, and placed McDaniel on probation. On appeal, he challenged the sufficiency of the evidence and alleged that the Commission must have relied upon *ex parte* evidence. A panel of this court declined to address his claim of *ex parte* influence. We noted that McDaniel had conceded that sufficient evidence existed to support the Commission's imposition of sanctions based upon his convictions; and, we concluded, "[r]eliance on McDaniel's convictions, evidence of which [wa]s indisputably in the record,

[wa]s enough to warrant suspension and demotion." *Id.* at 1224.

Here, although somewhat disputed, there is substantial evidence in the record to support the Board's findings that both Davis and Kirk violated KPD's reporting policies and procedures and were disciplined accordingly. Implicit in Davis and Kirk's arguments that KPD's internal investigation procedures did not contemplate the instant circumstance is the concession that they failed to comply with the same policy. Thus, in light of *McDaniel,* we decline to address this contention. We conclude further that in light of the substantial evidence of Davis and Kirk's conduct presented to the Board, the trial court's finding that it was not obliged to consider their claims of *ex parte* influence was not clearly erroneous.

Affirmed.

MAY, J., and BRADFORD, J., concur.