# FOR PUBLICATION



ATTORNEY FOR APPELLANTS:

**WILLIAM F. BERKSHIRE**
Peru, Indiana

ATTORNEY FOR APPELLEE:

**KRISTINA L. LYNN**
Lynn and Stein, P.C.
Wabash, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

PERU CITY POLICE DEPARTMENT and )
CITY OF PERU, )
     )
    Appellants-Defendants, )
     )
        vs. ) No. 52A02-1304-PL-350
     )
GREGORY MARTIN, )
     )
    Appellee-Plaintiff. )

APPEAL FROM THE MIAMI SUPERIOR COURT
The Honorable Richard A. Maughmer, Special Judge
Cause No. 52D01-1209-PL-342

September 3, 2013

**OPINION - FOR PUBLICATION**

**BAILEY, Judge**

**Case Summary**

City of Peru Chief of Police Steve Hoover ("Chief Hoover") recommended the termination of Gregory Martin ("Martin") from the City of Peru police force on account of excessive force and conduct unbecoming an officer with regard to his repeated use of a Taser upon an elderly nursing home patient. The City of Peru Board of Public Works and Safety ("the Board") conducted a hearing and terminated Martin's employment. On appeal, the trial court entered judgment reversing the termination decision, finding the Board decision to be unsupported by substantial evidence and arbitrary and capricious. The City of Peru and the Peru City Police Department now appeal, presenting the sole issue of whether the trial court erroneously substituted its decision for that of the Board. We reverse the trial court.

**Facts and Procedural History**

On June 17, 2012, Martin was dispatched to Miller's Merry Manor, after nurse Adam Chambers ("Chambers") called 9-1-1 and requested assistance to transport a combative patient to a hospital.[1] Martin was joined by Officer Jeremy Brindle ("Officer Brindle"). The officers were admitted to the locked Alzheimer's ward.

After ordering the staff to stay away, the officers entered the room of James Howard ("Howard"), a sixty-four-year-old Alzheimer's patient. They found Howard sitting in a chair and staring straight ahead. He was naked except for his socks. The officers commanded Howard to get on a gurney but he did not comply. Rather, Howard began "shuffling" toward

---

[1] Howard had struck his roommate, a nursing assistant, and a nurse. A physician had ordered a shot of Ativan to calm Howard after the first incident. However, Howard had a documented history of adverse reactions to Ativan; after he was given the shot, he became more agitated. When the staff reported heightened agitation, the physician then ordered that Howard be transported to Dukes Hospital.

Officer Brindle. (Tr. 217.) Howard's fists were clenched at his sides and he had a "blank look" as he advanced, backing Officer Brindle down a hallway to a "T" intersection. (Tr. 217.) Officer Brindle reached out and took hold of Howard's wrists in order to handcuff him, but lost control of one wrist.

Martin yelled "Taser" and deployed his Taser, with the prongs contacting Howard's torso. (Tr. 62.) Howard fell to the floor and onto his back. He was unable or unwilling to comply with officer commands to turn onto his stomach for handcuffing, and exhibited some voluntary or involuntary movement when he was not immobilized by the Taser. Ultimately, Martin used the Taser device upon Howard five times, with a total deployment of thirty-one seconds. Three were no-prong, skin-contact deployments referred to as a drive-stun.[2] The Taser data printout revealed the following sequence:

| | |
|---|---|
| Initial deployment: | 5 seconds |
| Taser off: | 6 seconds |
| Second deployment: | 5 seconds |
| Taser off: | 19 seconds |
| Drive-Stun: | 5 seconds |
| Taser off: | 2 seconds |
| Drive-Stun: | 5 seconds |
| Taser off: | 7 seconds |
| Drive-Stun: | 11 seconds |

(Tr. 586-89.) After the third Taser application, Howard was handcuffed. He was taken to the hospital, where his injuries were documented and found to include a black eye, bruising, marks on his side, and skin abrasions.

---

[2] According to Taser trainer Jon Jumper, the drive-stun technique can "greatly increase the effect … by touching it somewhere on the body," completing the circuit, and involving more muscles. (Tr. 291.) The drive-stun can leave "signature marks" which are "essentially burns." (Tr. 299.)

3

After Howard's wife complained about the treatment her husband had received, an internal investigation was launched and Martin was placed on administrative leave. Chief Hoover recommended Martin's dismissal due to his opinion that Martin had used excessive force and due to alleged inconsistencies between Martin's initial report and his statements during the internal investigation.[3]

On July 30 and August 10, 2012, the Board conducted a hearing at which several police officers and medical providers testified. Generally, the nursing home staff described Howard as combative before the 9-1-1 call, although he was more subdued and sitting in a chair when the officers arrived. The nursing home staff uniformly opined that Howard could have been controlled without Taser deployment. By contrast, each of the officers involved, Dukes Hospital EMT Marcus Corn, and paramedic Nikki Shambarger[4] opined that Martin did not use excessive force. However, Officer Brindle conceded that he and Martin could likely have gained control over Howard had each grabbed a wrist.

The Board found that Martin had used excessive force and engaged in conduct unbecoming an officer. Martin was discharged from his employment and he sought review in the trial court pursuant to Indiana Code section 36-8-3-4.

On December 14, 2012, the trial court conducted a hearing at which counsel for the parties represented that there was no new evidence to submit. However, the trial court ordered the parties to submit proposed findings of fact and conclusions of law. According to

---

[3] A report, in handwriting that Chief Hoover believed to be Martin's, stated that zero "touch stuns" were implemented. (Tr. 334.)

[4] Shambarger is Martin's fiancée.

4

the trial court's March 18, 2013 order, the trial court "reviewed the statute, court filings, and read in its entirety the record of the Board of Public Works and Safety of the City of Peru related to this action." (App. 7.) The trial court then entered more than one hundred "reasons that the decision should not be affirmed."[5] (App. 7.) This appeal ensued.

**Discussion and Decision**

I. Standard of Review

This Court reviews a decision of a municipal safety board as it does that of one by an administrative agency. Ind. Code § 36-8-3-4. Our review of an administrative decision is limited to whether the agency decision rests upon substantial evidence, whether the decision was arbitrary and capricious, and whether it was contrary to any constitutional, statutory, or legal principle. Fornelli v. City of Knox, 902 N.E.2d 889, 892 (Ind. Ct. App. 2009), trans. denied. We do not conduct a de novo trial, but defer to the fact-finding of the agency, so long as the findings are supported by substantial evidence. Id. Neither the trial court nor this court is permitted to reweigh the evidence or reassess witness credibility. Id.

Indiana Code section 36-8-3-4(h) provides that "[a] decision of the safety board is considered prima facie correct, and the burden of proof is on the party appealing." Thus, an aggrieved party who is attacking the evidentiary support for the agency's findings bears the burden of demonstrating that the agency's conclusions are clearly erroneous. Davis v. City of Kokomo, 919 N.E.2d 1213, 1222 (Ind. Ct. App. 2010). Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

---

[5] Indiana Code section 36-8-3-4(i) requires that the trial court enter specific findings.

Id. (citing Civil Rights Comm'n v. Marion Cnty. Sheriff's Dep't, 644 N.E.2d 913, 915 (Ind. Ct. App. 1994), trans. denied). An arbitrary and capricious decision is one which is "patently unreasonable" and made without consideration of the facts and in total disregard of the circumstances and lacks any basis which might lead a reasonable person to the same conclusion. City of Indpls. v. Woods, 703 N.E.2d 1087, 1091 (Ind. Ct. App. 1998), trans. denied.

In addition, "the discipline of police officers is within the province of the government's executive, rather than judicial, branch." Sullivan v. City of Evansville, 728 N.E.2d 182, 187 (Ind. Ct. App. 2000) (citing McDaniel v. City of Evansville, 604 N.E.2d 1223, 1225 (Ind. Ct. App. 1992), trans. denied). "For this reason, we will not substitute our judgment for that of the administrative body when no compelling circumstances are present." Id.

## II. Analysis

The following testimony and documentary evidence supports the Board's determination that Martin used excessive force and engaged in conduct unbecoming an officer. Martin was dispatched to transport an elderly nursing home patient to a hospital. He was admitted into a locked ward and was able to make certain observations upon his arrival at Howard's room: Howard was unclothed except for socks, he was seated and staring straight ahead, and he was verbally uncommunicative. Although Martin may not have been privy to a specific Alzheimer's diagnosis,[6] he was in a position to ascertain that the individual

_____

[6] No witness testified to having specifically told Martin of Howard's Alzheimer's diagnosis. However, one

to be transported was an elderly and infirm person. Lieutenant Matthew Feller ("Lieutenant Feller") testified that, when he arrived at the hospital to photograph Howard's injuries, he was able to determine, "within the first minute of meeting him," that there were "apparent … medical issues to the point that he could not even have a discussion … or respond to any question." (Tr. 38.)

Martin deployed the Taser and Howard hit the floor with a "slapping type thud." (Tr. 189.) The impact was so forceful that several of the nursing home staff were concerned that Howard had broken a hip or shoulder. According to Chambers, Howard "kind of flail[ed] around on the floor" as Martin repeatedly deployed the Taser. (Tr. 189.) Howard tried to sit up, but was unsuccessful. The multiple electrical charges put Howard into a "zonked out" state that Chambers described as "very lethargic, if not moving at all." (Tr. 190.) Chambers opined that the use of the Taser was unnecessary to induce compliance, as did nursing assistants U.L. Jones ("Jones"), Crystal Dunham, and Jodi Worden. Jones testified that he had personally been able to hold Howard at bay earlier in the day by placing his hand on Howard's chest.

Martin had, in April of 2012, been recertified on the use of a Taser, missing only one question on his written examination. His trainer, Jon Jumper ("Jumper") testified that Martin had specifically been instructed – in the recertification presentation – on the increased risk of death or serious injury for exposure over 15 seconds, whether due to multiple applications or continuous cycling. Martin had been instructed to avoid using a Taser on an "elevated-risk

employee reported during the internal investigation that he had told Martin he "was in the Alzheimer's unit." (Tr. 166.)

7

population" unless necessary and justifiable and was also instructed to attempt to verify "the person who is being Tased is capable of complying." (Tr. 87.) However, during the investigation as to use of force, Martin stated to Lieutenant Feller: "I have no idea if [Howard] could understand commands or not, he never spoke to us the entire time." (Tr. 85.)

The printed training materials (which had been displayed on a computer screen during training) advised: "Officer should consider that ECD exposure for longer than 15 seconds (whether due to multiple applications or continuous cycling) may increase the risk of death or serious injury," (Ex. 5, pg. 4); "Any subsequent ECD exposure (beyond 15 seconds of multiple applications or continuous cycling) should be independently justifiable, and the risks should be weighed against other force options," (Ex. 5, pg. 5); "[Officer] must give adequate time for volitional compliance: time 'to recover from extreme pain' experienced, opportunity to 'gather herself,' opportunity to 'consider her refusal to comply' with officer's commands/directives before next force application," (Ex. 5, pg. 13); "Person must be given a reasonable opportunity to comply with officer's directives prior to each ECD drive-stun application," (Ex. 5, pg. 14); "Any decision to apply multiple ECD [5 second] applications must take into consideration whether a suspect is capable of complying with officers' commands," (Ex. 5, pg. 24); "ECD use on these individuals [including the infirm and the elderly] could increase the risk of death or serious injury." (Ex. 5, pg. 48.)

Although greater duration than 15 seconds is not absolutely prohibited, the training materials repeatedly reference 15 seconds as an important benchmark. The majority of testing has been done for up to 15 seconds. Continued application is considered riskier and

8

greater justification is required.  Also, it is made plain that risks are heightened in vulnerable populations.

Finally, the officer is mandated to allow time for compliance.  According to Jumper, the police personnel appearing for recertification training had been informed of a determination, in one particular case that had been litigated, that 36 seconds between Taser applications was insufficient to facilitate compliance.  Here, the benchmark time was more than doubled – in five applications inflicted upon an elderly naked man in a nursing home, imminently destined for a hospital.  Intervals to achieve compliance were very short, with only a two-second interval between the third and fourth deployments.  Moreover, it is noteworthy that Howard was handcuffed after the third Taser application.

In sum, there is substantial evidence supporting the Board's decision.  It is not "patently unreasonable."  Woods, 703 N.E.2d at 1091.  The trial court disregarded evidence favorable to that decision, credited the testimony of witnesses that the trial court did not personally hear, and misstated evidence regarding the scope of Martin's training.[7]  In short, the trial court reweighed the evidence and reassessed the credibility of witnesses.

Substantial evidence supports the Board's findings, and its decision to terminate Martin for use of excessive force and conduct unbecoming an officer was not arbitrary and capricious.

Reversed.

---

[7] Jumper specified that Exhibit 5 (consisting of Version 18 materials, supplemented with Version 17 materials) were the recertification training materials taught to Martin via a slide presentation.  Martin testified that he had seen the slides.

9

MAY, J., and BRADFORD, J., concur.